**Cornelius Lamont JONES, Appellant**

v.

**The STATE of Texas, Appellee**

**NO. 14-16-00469-CR**

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion filed September 7, 2017

Discretionary Review Refused
January 10, 2018

Kyle Reeves Sampson, Houston, TX, for Appellant.

Christopher Conrad, Houston, TX, for State.

Panel consists of Chief Justice Frost and Justices Jamison and Busby.

## OPINION

Kem Thompson Frost, Chief Justice

Appellant Cornelius Lamont Jones challenges his conviction for capital murder. He takes issue with the sufficiency of the evidence, an evidentiary ruling, the trial court's denial of his request to charge the jury on spoliation, and the trial court's denial of jury-selection challenges. Con-

cluding these issues afford no basis for appellate relief, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The complainant and two associates dealt in marijuana. One of the associates facilitated a prospective purchase through the associate's friend's brother, who knew appellant. The brother arranged for the complainant to purchase twenty-five pounds of marijuana from appellant for about $10,000. The brother told the associates and the complainant where to go to complete the transaction and the three went together to the indicated apartment complex. Appellant got into their vehicle and showed the complainant a sample of the marijuana and then asked the complainant to walk with him to complete the purchase. As he exited the vehicle, the complainant had the money in his pocket, in a Crown Royal bag. The complainant also had on his person two cell phones and a gun. Appellant told the complainant to walk ahead of him.

Two residents were hanging out on the balcony of their apartment building when they saw two males—who appeared to be friends—walking down the sidewalk. Then, suddenly the two residents heard a gunshot. Within seconds, one of the residents ran around the apartment building and saw a body. The other resident called 911.

Meanwhile, the complainant's two associates, who had been waiting in their vehicle, started to become nervous. Both tried calling the complainant but he did not answer the phone. When the associates saw police officers arrive, they left the apartment complex believing they had been "set up."

Officer Mark Champaigne responded to the resident's 911 call and discovered the dead body of a male lying face down in the stairwell in between apartments. Deputy Mark McElvany investigated the crime

scene and recovered a single shell casing; he did not find any cell phones or guns on the complainant's body. He did find some cash in the complainant's pockets, but no Crown Royal bag filled with money.

The complainant's two associates spoke with police officers later that evening and told them about the marijuana deal. The police task force then began searching for the man (the brother of the associate's friend) who had set up the transaction. He was not home, but the police located that man's girlfriend. Sergeant Alanis gave her a list of nicknames of the people for whom he was searching and the girlfriend provided him with Facebook photographs of those individuals. Sergeant Alanis used those photographs to match up the nickname with appellant's true name.

Police officers then made photo spreads to show to witnesses. The complainant's two associates identified appellant as the man who entered their vehicle and left with the complainant to complete the marijuana purchase. The resident who discovered the complainant's body immediately after the shooting picked someone other than appellant from the photo spread. Police officers later disclosed to appellant's defense lawyers that the witness had identified another individual, but they did not save the photo spread to give to defense counsel.

When appellant was apprehended, he waived his rights and spoke with police investigators. Appellant admitted that he shot the complainant. He said that "something didn't feel right" about the transaction and then the complainant pulled a gun on appellant. Appellant said that they struggled and he shot the complainant in self-defense. Appellant admitted taking the complainant's phone and gun but said he did not take any money.

Appellant was charged with capital murder for killing the complainant in the course and scope of committing a robbery. Appellant pled "not guilty."

After voir dire, appellant made a challenge under *Batson v. Kentucky*, to four of the State's peremptory strikes. *See* 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed. 2d 69, 83 (1986). The trial court denied all four of appellant's challenges.

At trial, the complainant's two associates testified that they intended to complete the deal cleanly. One testified that he would never attempt to rob someone in an unknown location and that the complainant did not have the right physical attributes to successfully complete a robbery. (That associate touted his own background in robbery but testified that the complainant was more of a "hustler.") Both associates testified that the complainant had money in a Crown Royal bag to pay for the marijuana.

The two residents testified that they heard the gunshot very shortly after one of them saw the two men walking together. Both residents testified that they would have been able to hear screaming and that they heard neither screaming nor sounds of a scuffle. One resident noted there was not enough time for a scuffle in between the time he saw the men walking amicably and the gunshot.

At the charge conference, appellant requested a charge on spoliation of evidence due to the police department's failure to provide him with the photo spread the police had showed to the resident who did not identify appellant. The trial court denied the request.

The jury found appellant guilty as charged and appellant received an automatic sentence of life imprisonment. Appellant raises four issues in this appeal.

## Issues and Analysis

### A. Sufficiency of the Evidence

In his fourth issue, appellant asserts that the evidence is insufficient to support his conviction for capital murder because the evidence does not show he intended to rob the complainant. We address this issue first because, if sustained, it would afford appellant the greatest relief. *See* Tex. R. App. P. 43.3; *Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

In evaluating a challenge to the sufficiency of the evidence supporting a criminal conviction, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The jury is the sole judge of the witnesses' credibility and the strength of the evidence. *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the jury resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

A person commits capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit robbery. *See* Tex. Penal Code § 19.03(a)(2); *Dawkins v. State*, 495 S.W.3d 890, 895 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Under section 19.03(a)(2) of the Penal Code, "conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense" is conduct that occurs "in the course of committing" the offense. *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993). For a murder to qualify as capital murder, the intent to rob must be formed before or concurrently with the murder. *Id.* A jury may infer the intent to rob from the appellant's actions or conduct. *Id.*

Proof that appellant robbed the complainant as an afterthought and unrelated to the murder is not sufficient to prove capital murder. *See Dawkins*, 495 S.W.3d at 895. The State must prove that the murder occurred to facilitate the taking of the property. *Moody v. State*, 827 S.W.2d 875, 892 (Tex. Crim. App. 1992).

Appellant admitted to police that he shot the complainant. The medical examiner testified that the complainant died from a single gunshot. Appellant also admitted to police that he took the complainant's cell phones and gun from the body. The jury reasonably could have inferred appellant intended to take these items before he shot the complainant. The complainant's associates testified that the complainant was carrying $10,000 when he left the car to walk with appellant. Appellant confirmed that he expected to receive $10,000 from the complainant in exchange for twenty-five pounds of marijuana. One of the residents testified that he saw the complainant's body about twenty-five seconds after the shooting but did not see a Crown Royal bag or $10,000 near the complainant's body, nor did he see anyone running away from the body. Based on evidence that the complainant was carrying $10,000, appellant took some things from the body, and the very limited time frame in which anyone else could have stolen the $10,000, the jury reasonably could have inferred from that appellant

shot the complainant in the course of robbing him. *See Dawkins*, 495 S.W.3d at 896.

The complainant's two associates testified that they expected the complainant to enter an apartment where the marijuana would be located. Appellant said the marijuana was in the apartment of a man named "Jose," but appellant told police that he did not know any more information about Jose or where Jose lived. Since appellant claimed they were supposed to go to Jose's unit, the jury reasonably could have inferred from appellant's lack of knowledge that appellant made up the story about Jose and appellant never intended to complete the transaction, but instead intended to rob the complainant. *See Robertson*, 871 S.W.2d at 705.

The record contains sufficient evidence from which the jury reasonably could have inferred that appellant intentionally caused the death of the complainant in the course of robbing him. *See id.*; *Dawkins*, 495 S.W.3d at 896. We overrule appellant's fourth issue.

### B. Appellant's *Batson* Challenges

In his first issue, appellant asserts the trial court abused its discretion in denying his *Batson* challenges.

A prosecutor cannot use a peremptory strike against a venire member solely on account of race. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed. 2d 69, 83 (1986); *see* Tex. Code Crim. Proc. Ann. art. 35.261(a) (West 2011). In the face of perceived purposeful discrimination, an accused may assert a *Batson* challenge. *See* Tex. Code Crim. Proc. Ann. art. 35.261(a). On appeal, we afford great deference to the trial court's ruling on a *Batson* challenge. *See Jasper v. State*, 61 S.W.3d 413, 421–22 (Tex. Crim. App. 2001). We review the voir-dire record in the light most favorable to the trial court's ruling and reverse only when the ruling is clearly erroneous. *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009).

During voir dire, the prosecutor asked the panel if anyone would have a problem rendering a "guilty" verdict unless the State presented a particular piece of evidence like the murder weapon. Venire member 3 stated that he did not think he would be able to convict anyone without physical evidence. Venire member 14 said he was having a hard time with the whole case and that he would have a hard time convicting anyone. The prosecutor also asked the venire members to rank on a scale of one to four how difficult it would be for them to convict someone if the victim had been involved in a drug deal. After the venire members gave their answers, the State challenged several for cause. The trial court denied some of the challenges and granted others. The State then made its strikes, as summarized in the following charts:

*Venire Members Answering "One" or "Two"*

| Venire Member | Answer to Scaled Question | Did the State strike the juror? |
|---|---|---|
| 16 | One | Yes |
| 25 | One | Yes |
| 26 | One | Yes |
| 28 | One | Yes |
| 51 | One | Yes |
| 53 | One | Yes |
| 62 | One | Yes |
| 6 | Two | Yes |
| 15 | Two | Yes |
| 21 | Two | Yes |
| 32 | Two | No |
| 40 | Two | Yes |
| 49 | Two | Yes |
| 64 | Two | Yes |

*Venire Members Challenged for Cause by the State*

| Venire Member | Trial Court's Ruling | Did the State exercise a strike? |
|---|---|---|
| 3 | Denied | Yes |
| 4 | Granted | N/A |
| 7 | Granted | N/A |
| 14 | Denied | Yes |
| 18 | Granted | N/A |
| 20 | Denied | Yes |
| 26 | No ruling | Parties agreed to remove |
| 27 | Granted | N/A |
| 28 | Granted | N/A |
| 23 | Granted | N/A |
| 46 | Granted | N/A |

After voir dire, appellant made a *Batson* challenge to four of the State's peremptory strikes. Appellant stated, "Jurors 3, Juror No. 14, and Juror No. 49, all African-American. And No. 6." The trial judge asked the prosecutor if venire members 3 and 14 were venire members the prosecutor had challenged for cause. When the prosecutor answered affirmatively, the trial court denied appellant's challenges to jurors 3 and 14.

The trial judge then asked the prosecutor for explanations for striking venire members 6 and 49. The prosecutor gave three reasons for striking venire member 6: (1) she was young, (2) she had worked for a short amount of time, and (3) she answered "two" on the State's scaled question. The prosecutor likewise identified three reasons for striking venire member 49: (1) she was unemployed, (2) she answered "two" on the State's scaled question, and (3) she had to be pressed to answer the scaled question. The prosecutor added that the State struck everyone that answered "one" or "two" on the scaled question. Despite this statement, the record shows that venire member 32 answered "two" and the State did not strike venire member 32. The trial court denied appellant's challenges to venire members 6 and 49.

■■■■ To succeed on a *Batson* challenge, the accused must demonstrate by a preponderance of the evidence that the State indulged in purposeful discrimination against a member of a constitutionally-protected class in exercising peremptory challenges. *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). A *Batson* challenge consists of three steps. *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012). First, the defendant must make a prima facie case of purposeful racial discrimination by the State in the exercise of its peremptory strikes. *See Cantu*

*v. State*, 842 S.W.2d 667, 688 n.15 (Tex. Crim. App. 1992). Second, if the defendant makes this showing, the burden of production shifts to the State to furnish a race-neutral reason for exercising the strike. *Watkins*, 245 S.W.3d at 447. Third, the trial court must determine whether the defendant has proved purposeful discrimination. *Nieto*, 365 S.W.3d at 676.

■■■■ To make a prima facie case, a defendant must show that relevant circumstances raise an inference that the State made a race-based strike. *Flores v. State*, 33 S.W.3d 907, 925 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). An argument that the State has struck minority venire members, without more, is insufficient to make a prima facie case. *See Bean v. State*, 816 S.W.2d 115, 119–20 (Tex. App.—Houston [14th Dist.] 1991, no pet.). At the initial prima facie stage, the relevant circumstances need only give rise to an inference of discrimination. *Hassan v. State*, 369 S.W.3d 872, 875 (Tex. Crim. App. 2012). A statistical disparity between the proportion of venire members of a particular race that are struck versus the proportion of that race in the venire can support a prima facie case, but small sample sizes hinder the reliability of statistical disparities. *Id.* at 876. The Court of Criminal Appeals has suggested that three or more strikes against a cognizable racial group may be minimally sufficient to establish a prima facie case. *Id.* at 877. Combining insufficient statistics with other circumstances might give rise to a prima facie case of discrimination. *Id.* at 878.

■■■■ The defendant's burden to present a prima facie case becomes moot after the State offers its race-neutral explanation for striking a particular venire member. *Jones v. State*, 431 S.W.3d 149, 155 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). The race-neutral reason for the strike need not be persuasive or even plau-

sible, but only facially valid. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed. 2d 834 (1995). Unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. *Id.* The defendant may rebut the race-neutral explanation. *Jasper*, 61 S.W.3d at 421. In evaluating the defendant's rebuttal, the trial court must decide whether the accused has proven purposeful discrimination by a preponderance of the evidence. *Watkins*, 245 S.W.3d at 447.

### Venire members 6 and 49

▮ Appellant was not required to make a prima facie case for venire members 6 and 49 because the State offered its explanation for striking them and the State's explanation mooted appellant's burden to establish a prima facie case of purposeful racial discrimination. *See Jones*, 431 S.W.3d at 155. The State explained that it struck venire member 6 because the individual was young, had little work experience, and answered "two" for the State's scaled question. The prosecutor said that the State struck venire member 49 because she was unemployed, answered "two" for the scaled question, and had to be pressed to answer the scaled question. The prosecutor stated that the State struck each juror who answered "one" or "two" for the scaled question. The State did not strike each of the fifteen venire members who answered the scaled question "one" or "two." Because the prosecutor offered plausible race-neutral reasons for striking venire members 6 and 49, the trial court did not abuse its discretion in concluding the State met its burden to offer a race-neutral justification for the way it exercised its peremptory strikes. *See Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992).

▮ Because the State met its burden of production, we must assess whether the trial court clearly erred in concluding appellant did not prove purposeful discrimination. Appellant argues the State's explanations were not genuine and therefore a pretext for discrimination because (1) the State's explanations for striking venire members 6 and 49 applied equally to venire members of another race who were not eliminated and (2) the record contradicts the State's reason. The appellate record does not contain the racial composition of the panel or the race of the challenged venire members. Without this crucial information, we cannot perform the analysis to compare whether prosecutors treated venire members of different races differently. *See Miller–El v. Dretke*, 545 U.S. 231, 240–63, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (noting that an important factor in determining racial bias is comparing the way prosecutors treated venire members of different races); *Jones*, 431 S.W.3d at 155.

With respect to the first argument, appellant did not provide a record upon which this court can conduct the comparative analysis necessary to gauge any disparate treatment because the record does not contain venire member 32's race. *See* Tex. R. App. P. 34.5 (stating that appellant has burden to develop the record to show the nature and source of the error); *Ortiz v. State*, 144 S.W.3d 225, 230 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). We cannot assume that the unstricken venire member was a different race than the stricken venire members. *See Contreras v. State*, 56 S.W.3d 274, 280 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). And, because we cannot assume venire member 32's race differed from the race of venire members 6 and 49, we cannot conclude that the State's explanation for striking venire members 6 and 49 applied equally to a venire member of another race who was not eliminated. We do not know the

race of the venire members, the answers venire members gave in response to written questions, the race of the venire members stricken, or the race of the venire members selected, so, on this record, we cannot conclude the trial court clearly erred in determining appellant did not prove racial discrimination. *See Hatchett v. State*, 930 S.W.2d 844, 847 (Tex. App.— Houston [14th Dist.] 1996, pet. ref'd).

With respect to the second argument, the record supports appellant's contention that the State did not strike each venire member that answered "one" or "two" to the scaled question. But, the State provided additional race-neutral reasons for striking venire members 6 and 49. *See Cantu*, 842 S.W.2d at 689 (holding that trial judge did not abuse discretion in concluding State's reason for striking venire members were race-neutral although record contradicted one reason given by State). Defense counsel did not dispute the race-neutral reasons the State provided for striking these venire members. *See Yarborough v. State*, 947 S.W.2d 892, 895 (Tex. Crim. App. 1997) (noting that undisputed statements by attorneys on the record at *Batson* hearings constitute valid proof). Under the applicable standard of review, we defer to the trial court's assessment of the prosecutor's credibility in offering race-neutral reasons. *See Cantu*, 842 S.W.2d at 689.

### Venire members 3 and 14

■ Appellant did not establish a prima facie case of discrimination for venire members 3 and 14 because counsel simply stated that they were African-American without providing any context. The record does not indicate if any of the other members of the venire panel or jury were African-American or some other cognizable racial group. So, the requisite analysis cannot be done. *See Hatchett*, 930 S.W.2d at 847. Because appellant stated only that venire members 3 and 14 were African-American, he failed to establish a prima facie case of discrimination with respect to these venire members. *See Bean*, 816 S.W.2d at 119–20. To the extent appellant argues that the trial court erred in not allowing a full *Batson* hearing on these venire members, appellant did not preserve error on this complaint in the trial court. *See* Tex. R. App. P. 33.1; *Fowler v. State*, 863 S.W.2d 187, 189 (Tex. App.— Houston [14th Dist.] 1993, pet. ref'd).

Appellant asserts that he had no obligation to make a prima facie case because the prosecutor adopted the statements of the trial judge when the trial court denied the challenges to venire members 3 and 14. The trial judge stated that she was denying the *Batson* challenges of these venire members because the State had challenged them for cause. Even if we agreed that the State had adopted the trial judge's statements and so mooted appellant's obligation to make a prima facie case, the trial court still would not have erred in denying appellant's *Batson* challenges. The State gave a race-neutral explanation—that it struck venire members 3 and 14 because it had challenged them for cause and the trial court denied those challenges. *See Cantu*, 842 S.W.2d at 689. At that point, appellant had to carry the burden to prove purposeful discrimination. *See Watkins*, 245 S.W.3d at 447. But, for the reasons expressed above, appellant has not met his burden on appeal to provide a record showing the trial court clearly erred in determining appellant did not prove racial discrimination. *See Hatchett*, 930 S.W.2d at 847.

We conclude the trial court's denial of appellant's *Batson* challenges afford no basis for appellate relief. *See id.* We overrule appellant's first issue.

### C. Request to Charge Jury on Spoliation of Evidence

■ In his second issue, appellant contends the trial court committed charge error when it denied appellant's requested spoliation instruction. In making this request in the trial court, appellant did not specify any particular language or suggest any particular wording. On appeal, appellant has not cited any cases or otherwise identified what language a spoliation instruction should contain. Research has not revealed any cases on this point.

The Court of Criminal Appeals most recently addressed spoliation of evidence in a published opinion in 1898[1] in *Watson v. State*, 48 S.W. 185 (Tex. Crim. App. 1898). In this 119-year old case, the defendant, charged with theft of hogs he had killed, argued that he—not the complainant—owned the hogs in question. *See id.* at 186. The complainant stated that one could tell whether the hogs belonged to the complainant by looking at the ears, but nobody could find any remains of the hogs, including the ears. The Court of Criminal Appeals held that the defendant's actions— burning the entrails of the hogs and destroying or removing all of their remains— amounted to some evidence that the defendant had stolen the hogs. *See id.*

The *Watson* case suggests that a jury may draw an adverse inference from spoliation of evidence—a remedy the Supreme Court of Texas has recognized for spoliation of evidence in the civil context. *See Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 22–25 (Tex. 2014) (concluding that instructing a jury that it may draw an adverse inference from spoliation of evidence is a proper remedy for spoliation). In applying this adverse-inference rule in the criminal·law context, this·court has presumed for purposes of a harm analysis that the trial court should instruct the jury that it may draw an adverse inference from spoliation. *See Burdick v. State*, 474 S.W.3d 17, 28 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Appellant premises his arguments on such an instruction. In analyzing the issue, we presume, without deciding, that the trial court should have instructed the jury that it could infer that the lost or destroyed photo spread would have produced a result favorable to appellant. *See id.*

### *"Some Harm" Analysis Based On Presumed Error in Failing to Give Adverse-Inference Instruction*

■ We use a two-step process to analyze appellant's complaint of jury-charge error. First, we determine whether the trial court erred. *See Ngo v. State*, 175 S.W.3d 738, 754 (Tex. Crim. App. 2005). If the trial court erred, then we must determine whether the error harmed appellant under the framework of *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984). *Burdick*, 474 S.W.3d at 28. Under *Almanza*, the level of harm necessary for reversal depends on whether the defendant timely and specifically objected to the jury charge. *See Almanza*, 686 S.W.2d at 171. If the defendant did not object in the trial court, then we reverse only if the trial court's error was so egregious that the defendant did not have a fair and impartial trial. *Id.* Because appellant properly objected in the trial court, we will reverse if the error caused "some harm." *See id.* The

---

1. Research reveals that since 1898, the Court of Criminal Appeals addressed spoliation in two unpublished opinions. *See Ramirez v. State*, No. AP-75167, 2007 WL 4375936 (Tex. Crim. App. Dec. 12, 2007); *Moore v. State*, No. 74059, 2004 WL 231323 (Tex. Crim. App. Jan. 14, 2007). But, unpublished cases have no precedential value. In 2009, the Court of Criminal Appeals published an·opinion in which it remanded a spoliation issue to the court of appeals for the court of appeals to address preservation of error. *See Freeman v. State*, 286 S.W.3d 370 (Tex. Crim. App. 2009).

harm suffered must be actual, not merely theoretical. *See Burdick*, 474 S.W.3d at 28.

■ As noted, we presume for the sake of argument that the trial court erred in denying the spoliation instruction. To determine whether this presumed error harmed appellant, we consider (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) any other relevant information from the record. *Id.*

The record reveals that the police department did not save the photo spread police showed the resident who saw appellant and the complainant walking to the apartments. Appellant argues that the charge error harmed him because the spoliation instruction would have allowed the jury to determine that the individual the resident erroneously selected was actually the person who robbed the body. Although the jury charge did not contain any instruction that the jury could make an adverse inference from the State's destruction of the photo spread, the omission of the instruction did not harm appellant because the jury heard that the resident did not identify appellant and appellant admitted he shot the complainant.

Appellant contends that the jury could have inferred that the individual the resident selected from the photo spread was the person who robbed the body, but the inference appellant suggests is not a logical inference from spoliation of the photo spread. First, the resident did not see anyone rob the body; he testified that he was identifying one of the two men he saw walking in the apartment complex before he heard the gunshot. No reasonable juror could infer that the favorable result from the destroyed evidence was that the individual the resident identified from the photo spread robbed the body. Second, appellant admits that he was one of the two men the resident saw walking moments before the gunshot. A photo spread contained appellant's photo as well as the photos of several fillers who ostensibly resembled appellant but who had no nexus to the offense. The police officer who created the photo spread testified that he selected photos of individuals who looked like appellant for placement in the photo spread; he did not select photos of other individuals who may have had a connection to the scene. No reasonable juror could infer that a random individual, selected by the police because he happened to resemble appellant, robbed the body. Third, the State did not pretend the photo spread was favorable to the State. The State admitted that the missing evidence was favorable to appellant through testimony that the resident did not pick appellant's photograph out of the photo spread.

Through other witnesses' testimony and appellant's own statements, the jury heard overwhelming evidence that appellant was present at the shooting. Indeed, appellant admitted that he shot and killed the complainant and that he took the complainant's gun and cell phones after killing him.

Based on the jury charge, evidence, and arguments of counsel, we conclude that appellant did not suffer any harm from the trial court not giving a spoliation instruction. *See Burdick*, 474 S.W.3d at 28. Because we conclude that any error would be harmless, we overrule appellant's second issue.

### D. Admission of Photograph into Evidence

■ In his third issue, appellant contends the trial court abused its discretion in admitting into evidence State's Exhibit 57—one of the Facebook photographs the police obtained in their investigation. The photograph shows appellant and another male. Both are wearing white t-shirts and red baseball caps, and each is

making a "hang loose" sign with his right hand and holding a pile of cash in his left hand. Appellant objected to the trial court admitting this photograph into evidence, citing Texas Rules of Evidence 401 and 403. We review a trial court's decision to admit evidence under an abuse-of-discretion standard. *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016). To reverse the trial court's decision to admit the evidence, we must find that the ruling was so clearly wrong as to lie "outside the zone of reasonable disagreement." *Id.*

### Relevance

Under Rule 401, evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Tex. R. Evid. 401. A court will deem evidence relevant if the evidence is material to and probative of a matter properly provable in the case. *Henley*, 493 S.W.3d at 83–4. Evidence is material if it addresses any fact of consequence. *Id.* at 83. It is probative if it tends to make the existence of the fact more or less probable than it would be without the evidence. *Id.*

Appellant asserts that the photograph (Exhibit 57) is irrelevant because the date of the photograph is unknown. Sergeant Alanis testified that he had a suspect named "Monty Jones." The girlfriend provided him with the photograph and identified the individual in the photograph as "Monty." Sergeant Alanis compared that photograph to a booking photograph of appellant and was able to put together photo spreads to show the complainant's two associates. After identifying appellant, police eventually interviewed him. The photograph is material because it relates to the investigator's determination of those involved in the shooting for which appellant eventually was charged. The

photograph is probative evidence because investigators used it to identify appellant. Because the photograph is relevant, the trial court did not abuse its discretion in admitting it into evidence. *See* Tex. R. Evid. 401; *Henley*, 493 S.W.3d at 83.

### Probative value Weighed Against Prejudicial Effect

Appellant asserts that the trial court abused its discretion in admitting the photograph into evidence, arguing that the photograph is unfairly prejudicial and misleading because it shows him holding money. Appellant contends the jury might have believed that he got the money in the photograph by robbing the complainant.

Under Rule 403, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. In making the Rule 403 determination, a court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). We conclude that in balancing these considerations the trial court reasonably could have concluded the photograph was probative of appellant's identity and helped clarify how police tar-

geted appellant. Sergeant Alanis was following up on a lead—the name Monty Jones—and the girlfriend provided this photo of "Monty." Sergeant Alanis was able to match the photograph with appellant's booking photograph. The combination of the name and the photograph led the police to identify appellant. The photograph tended to make the witnesses' accounts more credible and so had some probative value. *See Gigliobianco*, 210 S.W.3d at 642.

While the photograph arguably was cumulative of other evidence, appellant attacked the police investigation, asserting that the police had "tunnel vision." The State was entitled to lay out the police's investigative steps to make its case as persuasively as possible. *See Alvarado v. State*, 912 S.W.2d 199, 213 (Tex. Crim. App. 1995) (discussing the "right" of parties to make case as persuasively as possible). The trial court reasonably could have concluded that the State needed to show the nexus between the identification and the photograph because none of the State's witnesses knew appellant's name. *See id.*

Appellant argues that the photograph—depicting him holding money—is unfairly prejudicial. We disagree. First, the jury knew only that the girlfriend printed the photograph from a social media service and the jury was not aware of when it was taken. This means the jury did not know if it were possible for the money to have belonged to the complainant. Second, the trial evidence showed appellant was a drug dealer involved in high-stakes narcotics transactions with large sums of money. In this context, the photograph of appellant with a large amount of cash most likely was viewed as a reflection of appellant's drug dealing. The State did not argue that the money depicted in the photograph belonged to the complainant. In closing, defense counsel pointed out that there was

no link between the photograph and the complainant's shooting. Likewise, the photograph was not misleading because the jury knew how the officer got the photograph and had no reason to think the money in the photograph was related to the robbery.

The trial court reasonably could have concluded that the presentation of the photograph for the purposes of identification of appellant would not consume an inordinate amount of time or needlessly duplicate evidence already admitted. The State introduced the photograph to explain how the detectives identified appellant. It is not a complicated piece of evidence and the State used it only one other time—as an example of appellant's untruthfulness with police. *See Gigliobianco*, 210 S.W.3d at 642. Under these circumstances, the trial court reasonably could have concluded the photograph was not unfairly prejudicial or misleading. *See id.* We overrule appellant's third issue.

### CONCLUSION

None of the points appellant has raised afford him appellate relief. The evidence is sufficient to support appellant's conviction. The trial court did not err in denying appellant's *Batson* challenges. Any error in failing to charge the jury on spoliation is harmless. And, the trial court did not abuse its discretion in admitting the photograph of appellant holding money (State's Exhibit 57) into evidence. Having overruled all of appellant's issues, we affirm the trial court's judgment.